IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IGNACIO MENDOZA,<br><br>    Petitioner,<br><br>vs.<br><br>M. ELIOT SPEARMAN, Warden, High Desert State Prison,[1]<br><br>    Respondent. | No. 2:15-cv-00903-JKS<br><br>MEMORANDUM DECISION |

  Ignacio Mendoza, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Mendoza is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at High Desert State Prison. Respondent has answered, and Mendoza has replied.

I. BACKGROUND/PRIOR PROCEEDINGS

  On October 23, 2010, Mendoza was charged with the murder of his wife. The information also alleged that: 1) during the commission of the offense, Mendoza had discharged a firearm, causing great bodily injury; and 2) that the murder was committed in the course of committing or attempting to commit felony kidnapping. On direct appeal of his conviction, the California Court of Appeal laid out the following facts underlying the charges against Mendoza and the evidence presented at trial:

> **Prosecution Evidence**
>   On the afternoon of May 26, 2007, Yolo County Sheriff's Deputy Chris Whitehead responded to a reported assault at an almond orchard in Zamora. When he

---

  [1]  M. Eliot Spearman, Warden, High Desert State Prison, is substituted for Dave Davey, former Warden, California State Prison-Corcoran. FED. R. CIV. P. 25(c).

arrived, he found several farm personnel standing over the body of a female, who was lying in the orchard. She was not moving and was unresponsive.

The victim was identified as Guadalupe Benitez. Benitez was part of a crew that was pruning almond trees. She had started work at 7:00 a.m. [Mendoza] arrived shortly before 3:00 p.m., driving his car into the orchard in reverse. [Mendoza] had identified himself to members of the crew as Benitez's husband.

[Mendoza] drove directly to Benitez and the two argued as [Mendoza] drove along side of her. The foreman of the work crew could not hear all that was said but did hear [Mendoza] tell Benitez to get in the car. Benitez said she did not want to go. After [Mendoza] got stuck in the mud, the foreman told [Mendoza] to leave the orchard. [Mendoza] moved his car out of the mud and left. The foreperson told Benitez if she wanted to go, that would be fine and she said she wanted to continue working.

After [Mendoza] left the orchard, he returned to the County Road that ran alongside the orchard, where he drove back and forth, forward and in reverse. His speed was approximately five to 10 miles per hour.

At some later point, [Mendoza] drove back into the orchard and got out of the car. When he got out of the car he immediately pointed a shotgun at Benitez and again demanded that Benitez get into the car. The crew member nearest to Benitez walked over and urged [Mendoza] to calm down. [Mendoza] paid the crew member no attention.

According to the crew member, [Mendoza] told Benitez to get in the car three times. Benitez told [Mendoza] she was not going to go with him. The crew member testified that after the third time [Mendoza] told Benitez to get in the car, she told [Mendoza] , "if he was going to kill her, just kill her right then." [Mendoza] fired the shotgun into Benitez's chest. Another crew member testified that [Mendoza] told Benitez to go with him or come with him, and she said she was not going. Then, just before she was shot, Benitez told [Mendoza], "If you are going to kill me, kill me here."[FN2]

> FN2. There appears to have been some confusion about the appropriate translation of the Spanish word "aquie" in this context. The person interpreting for [Mendoza] indicated the word should be translated "here." The interpreter who translated for the witnesses initially indicated that the word could reference time or space—"now" or "here"—interchangeably, but then agreed the translation should be "here."

Without saying anything, [Mendoza] got back into his car and immediately drove away. The crew foreman telephoned 911.

According to one of the crew members, [Mendoza] was only three to four feet away from Benitez when he fired the shotgun into her chest. The parties stipulated that Benitez was killed on May 26, 2007, by a shotgun blast inflicted at close range that severed her aorta as well as penetrating her heart, lungs, and spine.

Benitez's son, G.F., who was 17 at the time of trial, testified that he "wasn't really surprised," in that he "could have seen" his father doing this sort of thing to his mother. G.F. testified that he had seen his parents arguing in the past and that [Mendoza] had

been violent to his mother on multiple occasions. [Mendoza] had threatened violence to Benitez's family if she left him. G.F. testified that on one occasion, [Mendoza] forced his way into the family home and threatened his mother with a knife. [Mendoza] tried to talk to Benitez, but she would not talk to him because "it was too much already." The police were called, but defendant left before they arrived. G.F. said this event took place around the time of the murder, but he was not sure when.

G.F. also testified that on the morning of the murder, [Mendoza] appeared at the house unannounced, tearfully hugged both children, told them that he loved them, and then left. This "confused" both G.F. and his sibling. Neither child could understand what was going on. G.F. had seen [Mendoza] cry before, but G.F. found this "unusual because he just came out of nowhere . . . I didn't know any reason for him to be crying or anything."

Yolo County investigators obtained a warrant for [Mendoza's] arrest after the murder. However, it was determined that [Mendoza] had fled to Mexico, so procedures were implemented to extradite him. [Mendoza] was not returned to Yolo County custody until 2010.

**Defense Evidence**

An investigator for the district attorney's office testified that she interviewed G.F. in December 2010. G.F. told the investigator that he had never seen his father hit his mother.

[Mendoza] did not testify.

*People v. Mendoza*, No. C069250, 2014 WL 4948228, at *1-3 (Cal. Ct. App. Oct. 3, 2014).

At the conclusion of trial, the jury convicted Mendoza of first degree murder and found true an attempted kidnapping special circumstance and an allegation that Mendoza intentionally and personally discharged a firearm causing great bodily injury. The trial court subsequently sentenced Mendoza to consecutive indeterminate terms of life without the possibility of parole ("LWOP") plus 25 years to life imprisonment.

Through counsel, Mendoza appealed his conviction, arguing that the trial court erred by: 1) failing to instruct the jurors with CALCRIM No. 731 on the elements of the attempted kidnapping special circumstance; 2) imposing a parole revocation restitution fine; and 3) failing to instruct the jurors on the lesser included offenses of attempted false imprisonment and involuntary manslaughter. The California Court of Appeal struck the parole revocation

3

restitution fine but unanimously affirmed the judgment against Mendoza in a reasoned, unpublished opinion issued on October 3, 2014. *Mendoza*, 2014 WL 4948228, at *8. The California Supreme Court summarily denied review on January 14, 2015. His conviction became final on direct review 90 days later, when his time to file a petition for certiorari in the U.S. Supreme Court expired on April 14, 2015. *See Jiminez v. Quarterman*, 555 U.S. 113, 119 (2009); *Spitsyn v. Moore*, 345 F.3d 796, 798 (9th Cir. 2003).

Mendoza timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on April 23, 2015. Docket No. 1 ("Petition"); *see* 28 U.S.C. § 2244(d)(1)(A).

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Mendoza raises two grounds for relief. First, he argues that the trial court committed prejudicial error when it failed to instruct the jury on the elements of the kidnapping special circumstance. He additionally avers that the trial court erred when it failed to instruct the jury on the lesser included offenses of false imprisonment and involuntary manslaughter.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that

4

are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication

on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

In his *pro se* Petition before this Court, Mendoza raises two claims challenging the propriety of instructions charged to the jury. Because jury instructions in state trial are typically matters of state law, federal courts are bound by a state appellate court's determination that a jury instruction was not warranted under state law. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (noting that the Supreme Court has repeatedly held that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *see also Williams v. Calderon*, 52 F.3d 1465, 1480-81 (9th Cir. 1995). An instructional error, therefore, "does not alone raise a ground cognizable in a federal habeas proceeding." *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1986) (citation omitted).

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990). The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment. *Francis v. Franklin*, 471 U.S. 307, 309 (1985). This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the

6

law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72. This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn. *Id.* at 72-73. "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation." *Id*. Where the defect is the failure to give an instruction, the burden is even heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law. *See Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). In those cases, the inquiry is whether the trial court's refusal to give the requested instruction "so infected the entire trial that the resulting conviction violates due process." *See id.* at 156-57; *Estelle*, 502 U.S. at 72. Moreover, even if the trial court's failure to give the instruction violated due process, habeas relief would still not be available unless the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *California v. Roy*, 519 U.S. 2, 5 (1996).

**<u>Ground 1.</u>** *Failure to instruct on the elements of the kidnapping special circumstance*

Mendoza argues in Ground 1 that the trial court prejudicially erred when it failed to instruct jurors on the elements of the kidnapping special circumstance. In responding to this

claim on direct appeal, the State conceded that the trial court erred in failing to instruct the jurors with CALCRIM No. 731, the elements of the attempted kidnapping special circumstance.[2] It nonetheless argued that the omission was harmless. The California Court of Appeal considered and rejected the claim as follows:

> [Mendoza] acknowledges that much of CALCRIM No. 731 mirrors the felony murder instructions, CALCRIM Nos. 521 and 549, but points out that one element required for the special circumstance is missing—the element of intent to kill.

---

[2] At the time of Mendoza's trial, CALCRIM No. 731 (2006–2007) stated in relevant part:

"The defendant is charged with the special circumstance of intentional murder while engaged in the commission of kidnapping.

"To prove that this special circumstance is true, the People must prove that:

"1. The defendant (committed [or attempted to commit] ...) kidnapping;

"2. The defendant (intended to commit ...) kidnapping; [¶] ... [¶]

"(3/4). (The defendant ...) did an act that was a substantial factor in causing the death of another person;

"(4/5). *The defendant intended that the other person be killed* ;

"[AND]

"(5/6). The act causing the death and the kidnapping [or attempted kidnapping] were part of one continuous transaction; [¶] ... [¶]

"AND (6/7). There was a logical connection between the act causing the death and the kidnapping [or attempted kidnapping]. The connection between the fatal act and the kidnapping [or attempted kidnapping] must involve more than just their occurrence at the same time and place. [¶] ... [¶]

"[If all the listed elements are proved, you may find this special circumstance true even if the defendant intended solely to commit murder and the commission of kidnapping was merely part of or incidental to the commission of that murder.]" (Italics added.)

[Mendoza] contends that omission of CALCRIM No. 731 was prejudicial because the intent to kill element is in that instruction. [Mendoza] reasons that, because the case was tried on alternative theories of premeditated murder and felony murder, the jury was not required to find intent to kill Benitez under any instruction.

We conclude the error was harmless.

**A. Standard of Review**

[Mendoza] acknowledges that instructional error is harmless "where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error." (*Neder v. United States* (1999) 527 U.S. 1, 17 [144 L.Ed.2d 35, 52] (*Neder*); accord, *People v. Mil* (2012) 53 Cal.4th 400, 417–419 [omission of two elements from robbery special circumstance instruction related to an aider and abettor was subject to harmless error analysis under the *Neder* test].) In such circumstances, the error does not contribute to the verdict obtained. (*Neder*, *supra*, 527 U.S. at p. 17; *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710–711].)

Thus, according to *Neder*, we must engage in a two-part inquiry: (1) Was the element on which the trial court failed to instruct contested and (2) was proof of that element supported by overwhelming evidence?

**B. Uncontested Element of Intent to Kill**

While the element of deliberation and premeditation was contested, the element of intent to kill was not. We look to defense counsel's closing argument to determine whether an element was contested. Based on our reading of defense counsel's closing argument, we conclude that the defense conceded the issue of [Mendoza's] intent to kill.

Defense counsel began her argument by telling the jurors they were "presented with two choices. You are presented with a choice of first-degree murder and you're presented with a choice of second-degree murder. [¶] Of course, there is a third choice that the prosecutor didn't touch on, and I'm not going to touch upon either, and that is for a full acquittal of all these charges."

Defense counsel next said, "This was a killing borne by emotional upheaval and passion, *not with a desire or intent to kill his wife*." (Italics added.) At first blush, this argument appears inconsistent with a concession that the killing was intentional. However, we look at this statement in the context of the entire argument and the murder theories upon which the jury was instructed.

There were only two theories of second degree murder in this case, implied and express malice. After saying the jury had a choice between first and second degree murder, defense counsel never argued the murder was committed with implied malice. Defense counsel's comments, instead, appear intended to negate the elements of deliberation and premeditation required for first degree murder, as opposed to the intent to kill that, absent implied malice, is required for second degree murder.

Defense counsel went on to tell the jury, "a *decision to kill* made rashly, impulsively, or without careful consideration is not deliberate and premeditated; it's second degree." (Italics added.) Counsel then argued that someone premeditating

9

murder does not plan to commit the act in front of several witnesses; nor does one announce his presence to a person he had met a couple weeks previously, *i.e.*, by arriving in his own license-plate-adorned car and then driving in and out of the orchard. Rather, "that is all consistent with a killing that is rash, impulsive, and without contemplation."

Defense counsel next argued that, when [Mendoza] ordered Benitez into the car, he never made a threat to kill her. "[W]e didn't hear, get in the car or I'm going to kill you." Counsel then argued "[t]here's no additional language offered that would suggest that there was *an intent to kill*." (Italics added.) Again, in the context of the entire argument, the italicized words appear to refer to the lack of pre-existing intent or design at the time of the attempted kidnapping; the argument does not suggest an absence of intent to kill at the moment [Mendoza] shot Benitez in the chest.

Defense counsel's conflating of intent to kill with deliberation and premeditation is revealed more plainly in her comments regarding G.F.'s opinion that [Mendoza] was capable of committing the murder. Counsel remarked: "So the argument that somehow this opinion from the 13–year–old, now 17 somehow supports a premeditated, willful state of mind is illogical because we don't have enough facts to say that there was some sort of intent to kill *expressed at an earlier date*. [¶] The interpretation of that particular opinion could fall either way; towards a premeditated, deliberate, willful murder or to a killing, a type of murder that is done rashly and impulsively without contemplation." (Italics added.)

At the end of the closing argument, defense counsel remarked: "What you have here is an argument and a tragic killing and facts that are sufficient to support a murder in the second degree." Again, after having said the choice was between first and second degree murder, defense counsel never sought to distinguish express and implied malice, never even mentioned implied malice and never suggested the facts supported a theory of conscious disregard for human life, while somehow insufficient to support a theory of intent to kill. Moreover, on this record, there was no basis to argue that although [Mendoza] knew that shooting was "dangerous to human life," and he "deliberately acted with conscious disregard for human life," he somehow did not intend to kill. Instead, defense counsel effectively conceded the issue of [Mendoza's] intent to kill and focused on the elements of deliberation and premeditation.

We conclude the element of intent to kill was "uncontested" within the meaning of *Neder*.

Citing *People v. Lasko* (2000) 23 Cal.4th 101, 108–110 (*Lasko*) and his request for a voluntary manslaughter instruction4 in his reply brief, [Mendoza] contends for the first time that his trial theory was that he fired the gun in the heat of passion "*and did not intend to kill his wife*." (Italics added.) However, [Mendoza] fails to cite to anything in the record that supports this belated claim.

Our high court in *Lasko* held that a killer who, acting with conscious disregard for life and knowing that the conduct endangers another, unintentionally kills in a sudden quarrel or heat of passion (provocation) is guilty of voluntary manslaughter. (*Lasko*, supra, 23 Cal.4th at p. 104.) In this case, the lack of evidence of provocation meant the *Lasko* theory of voluntary manslaughter did not apply. And in any event, as we have

noted, there is simply no evidence here that [Mendoza] fired the weapon in conscious disregard for life as opposed to an intent to kill.

**C. Overwhelming Evidence of Intent to Kill**

The element of intent to kill was "supported by overwhelming evidence" within the meaning of *Neder*. The evidence showed a history of domestic discord, including verbal threats and brandishing a weapon. [Mendoza's] odd behavior with the children the morning of the shooting, when considered in light of his later conduct, supports the strong inference that he had resigned himself to take drastic action and did not think he would see the children again. He went looking for Benitez with a loaded shotgun. Undisputed evidence showed that [Mendoza] fired the shotgun at Benitez at close range after she invited him to kill her right there in the orchard because she was not going to leave with him. Indeed, the specific words she used were, "If you are going to kill me, kill me here." [Mendoza] then did just that. He killed her right where she stood. No evidence suggested the gun discharged accidentally. Indeed, in finding true the firearm enhancement, the jury necessarily concluded that [Mendoza] intentionally and personally discharged the shotgun. (§ 12022.53, subd. (d).) No evidence suggested that he fired the gun simply in conscious disregard that discharging the gun under such circumstances was dangerous to human life. On this record, the evidence that [Mendoza] intended to kill Benitez was overwhelming. (*Neder*, *supra*, 527 U.S. at p. 17 [144 L.Ed.2d at p. 52].)

**D. Conclusion**

We conclude beyond a reasonable doubt that the omitted intent element was uncontested and supported by overwhelming evidence. (*See People v. Mil*, *supra*, 53 Cal.4th at p. 417.) Thus, the omission of CALCRIM No. 731 and the intent to kill element from the instructions was harmless beyond a reasonable doubt. (*Neder*, *supra*, 527 U.S. at p. 17; *Chapman v. California*, *supra*, 386 U.S. at p. 24 [17 L.Ed.2d at pp. 710–711].)

*Mendoza*, 2014 WL 4948228, at *3-5 (citations omitted).

Applying *Chapman v. California*, 386 U.S. 18 (1967), and *Neder v. United States*, 527 U.S. 1 (1999), the California Court of Appeal found that the trial court's erroneous failure to instruct the jury with CALCRIM No. 731, the elements of the attempted kidnapping special circumstance, was harmless. Under *Chapman*, "the test for determining whether a constitutional error is harmless . . . is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Neder*, 527 U.S. at 15 (quoting *Chapman*, 386 U.S. at 24). The U.S. Supreme Court has held that when a state court's "*Chapman* decision is

11

reviewed under AEDPA, 'a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable.'" *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015) (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007)). To prevail on this claim, Mendoza therefore must show that the state court's harmless error determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Ayala*, 135 S. Ct. at 2199 (internal quotation marks omitted) (quoting *Richter*, 562 U.S. at 103).

Mendoza fails to satisfy this heavy burden. As the Court of Appeal explained, the omitted instruction mirrored the felony murder instructions as given, with the exception of one element required for the special circumstance–intent to kill. The Court of Appeal found that either: 1) the defense did not contest the issue of Mendoza's intent to kill, or 2) the element of intent to kill was "supported by overwhelming evidence." Because the parties apparently agree that *Neder* establishes controlling law and that the Court of Appeal properly interpreted it, Mendoza's claim before this Court presents a purely factual question: whether the Court of Appeal's finding that the defense conceded an intent to kill or, alternatively, that the evidence of intent to kill was overwhelming was unreasonable. Although it appears to present a close question whether the defense conceded the issue or the evidence of intent to kill was overwhelming, this Court cannot say that the Court of Appeal's determination in the affirmative was unreasonable. For the reasons thoroughly and persuasively provided by the Court of Appeal, and in light of the jury verdicts, the state court's harmless error determination was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that

12

there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Accordingly, Mendoza is not entitled to habeas relief on this claim.

**Ground 2.** *Failure to instruct on lesser-included offenses*

Mendoza additionally argues that the trial court erred in failing to instruct the jurors on the lesser-included offenses of involuntary manslaughter and false imprisonment. The United States Supreme Court has held that the failure to instruct on a lesser included offense in a capital case is constitutional error if there was evidence to support the instruction. *Beck v. Alabama*, 447 U.S. 625, 638 (1980). The Supreme Court, however, has not decided whether to extend this rationale to non-capital cases. The Ninth Circuit, like several other federal circuits, has declined to extend *Beck* to find constitutional error arising from the failure to instruct on a lesser included offense in a non-capital case. *See Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000); *Windham v. Merkle*, 163 F.3d 1092, 1106 (9th Cir. 1998) ("[T]he failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question."); *James v. Reese*, 546 F.2d 325, 327 (9th Cir. 1976) ("Failure of a state court to instruct on a lesser offense fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding."). Accordingly, the decision of the California courts denying Mendoza relief as to this claim was not contrary to United States Supreme Court authority as set forth in *Beck*.

Nevertheless, the Ninth Circuit has stated, without deciding, that "the refusal by a court to instruct a jury on lesser included offenses, when those offenses are consistent with defendant's theory of the case, may constitute a cognizable habeas claim" under clearly established United

States Supreme Court precedent. *Solis*, 219 F.3d at 929.[3] In an abundance of caution, the Court will nonetheless address the merits of Mendoza's claims.

### 1. *False imprisonment*

In rejecting this claim on direct appeal, the Court of Appeal explained that Mendoza was not charged with the substantive offense of kidnapping or attempted kidnapping; rather, he was charged with the special circumstance of murder in the commission of a felony (kidnapping or attempted kidnapping). *Mendoza*, 2014 WL 4948228, at *6. The Court of Appeal likened the special circumstance to "a sentencing enhancement and, as such, does not contain 'lesser included offenses.'" *Id.* (citing *People v. Wolcott*, 665 P.2d 520, 525-26 (Cal. 1983). This Court is bound by the state court's determination of state law. *See West v. AT & T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law. . . ."); *see also Hicks v. Feiock*, 485 U.S. 624, 629-30 & n.3 (1988) (noting that a state appellate court's determination of state law is binding and must be given deference); *West*, 311 U.S. at 237 ("This is the more so where, as in this case, the highest court has refused to review the lower court's decision rendered in one phase of the very litigation which is now prosecuted by the same parties before the federal court."). Mendoza's claim therefore must fail.

---

[3] A number of district courts in the Ninth Circuit, including this one, have questioned whether the Ninth Circuit's statement in *Solis* is required by the holdings of clearly-established Supreme Court authority. *See, e.g.*, *Garcia v. Sherman*, No. 14-cv-00980, 2018 WL 347866, at *15 n.1 (E.D. Cal. Jan. 10, 2018) (explaining that subsequent Ninth Circuit cases have cited *Solis* "for the absolute proposition that there is no clearly established federal constitutional right to instructions on lesser-included offenses in non-capital cases); *Chaidez v. Knowles*, 258 F. Supp. 2d 1069, 1096 n.15 (N.D. Cal. 2003) (suggesting that there is no clearly established Supreme Court authority for the *Solis* proposition). As discussed *infra*, however, Mendoza does not benefit from the *Solis* proposition in any event.

## 2. *Involuntary manslaughter*

Mendoza relatedly argues that, because he was entitled to a *sua sponte* instruction on attempted false imprisonment as a lesser offense to attempted kidnapping, he was also entitled to an involuntary manslaughter instruction because a killing committed in the course of an attempted false imprisonment, rather than in the course of an attempted kidnapping, constitutes involuntary manslaughter. As discussed above, however, Mendoza was not entitled to a false imprisonment instruction; it therefore follows that he was not entitled to an involuntary manslaughter instruction either.

Moreover, the Court of Appeal rejected Mendoza's contention that there was no evidence showing that Mendoza intended to move the victim a substantial distance such that an attempted false imprisonment instruction warranted. As the Court of Appeal noted:

> [W]e conclude there was no evidence supporting a conclusion that he did not intend to move the victim anywhere.
> During the first encounter in the orchard, [Mendoza] was overheard telling Benitez to get into the car. While the crew foreperson could not hear all that was said, he heard Benitez tell [Mendoza] she did not want to go. When the crew foreperson offered to allow Benitez to go, she said she wanted to stay. When [Mendoza] came back, one of the crew members heard him order Benitez to come with or go with him. Another heard [Mendoza] order Benitez to get into the car and heard Benitez reply she was not going with him. After [Mendoza] demanded that Benitez get in the car for the third time, Benitez said, "If you are going to kill me, *kill me here*." (Italics added.) All of this evidence shows [Mendoza] had indicated to Benitez that he wanted her to go with him and she did not want to leave. There was simply no evidence that [Mendoza] intended to have a conversation with Benitez in the car parked there in the orchard, as [Mendoza] implies. Indeed, [Mendoza] had been earlier told to take the car out of the orchard.

*Mendoza*, 2014 WL 4948228, at *7-8.

The Court of Appeal's conclusion is both reasonable and fully supported by the record, as is its alternate conclusion that, "even assuming for argument sake that the trial court should have instructed on involuntary manslaughter on a noninherently dangerous felony theory, any

15

error is harmless," in light of the overwhelming evidence of intent to kill and evidence of deliberation and premeditation. *Id.* at *8. In light of the evidence, Mendoza demonstrates no reasonable probability of a different result had an involuntary manslaughter instruction be given. Mendoza is thus not entitled to relief on this claim either.

## V. CONCLUSION AND ORDER

Mendoza is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals. *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: March 22, 2019.

                                                   /s/James K. Singleton, Jr.
                                                   JAMES K. SINGLETON, JR.
                                                   Senior United States District Judge